STATE OF NORTH CAROLINA v. ELTON OZELL McLAUGHLIN

No. 637A84

(Filed 7 September 1988)

1. **Constitutional Law § 28— complicated case—denial of motion to have trial judge retain jurisdiction over all matters—no due process violation**

    The trial court did not err in a prosecution for three first degree murders by denying defendant's motion to have the trial judge retain jurisdiction over all matters pertaining to the trial on the grounds that this was a complicated case and that due process therefore required one judge to hear all pretrial mo-

State v. McLaughlin

tions and procedural matters and hear the case. Fifth Amendment to the U. S. Constitution, Art. I, § 19 of the North Carolina Constitution.

**2. Constitutional Law § 31; Criminal Law § 5— motion for independent psychiatric exam properly denied—testimony from psychiatrist properly admitted**

In a prosecution for three first degree murders, the report of a psychiatrist was properly introduced into evidence at a pretrial hearing to determine defendant's competency to stand trial even though defendant's motion for an independent psychiatric examination was denied where defendant failed to object to the report's introduction at the competency hearing; defendant made no ex parte threshold showing that his sanity at the time of the crime was likely to be a significant factor in his defense; the State-appointed psychiatrist testified that his examination of defendant lasted approximately two weeks, during which he could recall two long interviews with defendant; and the record contains no evidence that defendant was emotionally disturbed or unable to conform his conduct to the requirements of the law.

**3. Constitutional Law § 31— denial of funds to hire private investigator—no error**

The trial court did not err in a first degree murder prosecution by denying defendant's motion for funds to hire a private investigator where defendant made no clear showing that specific evidence was reasonably available and necessary for a proper defense, and the court advised defendant's two attorneys that they could return to the court if they encountered problems. N.C.G.S. § 7A-450(b) (1986).

**4. Indictment and Warrant § 13.1; Constitutional Law § 30— denial of bill of particulars for aggravating factors—denial of list of State's witnesses—no error**

Defendant in a first degree murder prosecution was not denied due process by the denial of his motion for a bill of particulars on the aggravating factors to be offered during the sentencing phase of his trial or because he was not provided with a list of the State's witnesses. N.C.G.S. § 15A-2000(e).

**5. Constitutional Law § 30— murder—motion for discovery denied—no error**

The trial court did not err in a prosecution for three first degree murders by the denial of defendant's motion for discovery of the names and addresses of all persons interviewed by the State with copies of their statements; the total list of persons interviewed in the entire investigation, with accounts of the interviews and the names of the interviewers; a detailed list of the criminal records of all State witnesses; and all written reports, documents or physical evidence in the possession of the State or the prosecution relative to defendant's case or its investigation. N.C.G.S. § 15A-903(d); N.C.G.S. § 15A-904(a).

**6. Criminal Law § 91.1; Constitutional Law § 28— denial of motion to continue suppression hearing—no error**

There was no error and defendant was not denied due process in a first degree murder prosecution from the trial court's denial of his motion to continue an evidence suppression hearing because defendant's two counsel needed more time to prepare. Defendant failed to argue a due process right in either his written or oral motion and failed to show prejudice.

State v. McLaughlin

7. Criminal Law § 75— murder—statements to law enforcement officers—given voluntarily

The trial court did not err by refusing to suppress defendant's statements to law enforcement officers on the grounds that they were not given voluntarily where the trial judge's order contained extensive findings showing that defendant had been fully advised of and waived his constitutional rights; he was fully coherent, did not appear to be under the influence of alcohol or drugs and showed no desire to stop talking or request an attorney; the interviewing officers made no threats against defendant, nor did they make any promises in return for his statements; and defendant failed to except to any of the trial judge's findings of fact.

8. Searches and Seizures § 29— search warrant—statutory requirements for application and for warrant—no error

There was no error in a murder prosecution where defendant alleged that a search warrant application for his home and automobile did not meet the requirements of N.C.G.S. § 15A-244 and that the warrant itself did not satisfy N.C.G.S. § 15A-246(2) where the trial court's order contains thorough findings of fact supporting its conclusion that the search warrant met the N.C.G.S. § 15A-244 standard and defendant failed to raise the issue of whether the warrant met statutory requirements at trial.

9. Jury § 6— individual voir dire—sequestration of jurors—denied—no error

There was no error in a murder prosecution from the trial court's refusal to require that the jurors be sequestered at night or from the denial of defendant's motion for individual voir dire of prospective jurors where the jury was selected from citizens of another county; the trial court frequently admonished the jury; defendant presented no evidence that the jury did anything other than follow the trial court's orders; and defendant's argument concerning individual voir dire was speculative at best.

10. Jury § 7.11; Constitutional Law § 63— death qualified jury—no error

The trial court did not err in a murder prosecution by death qualifying the jury.

11. Criminal Law § 91.4— murder trial—one week absence of one attorney—continuance denied—no error

The trial court did not err in a murder prosecution by denying defendant's motion for a continuance where defendant had two attorneys representing him for four months and one attorney was absent for one week to attend a sick relative.

12. Constitutional Law § 31— denial of jury selection expert—no error

The trial court in a murder prosecution did not err by denying defendant's motion for funds for a jury selection expert where defendant failed to show a particularized need for expert assistance.

13. Jury § 7.4— challenge to array—insufficient evidence of racial discrimination

The trial court correctly denied a murder defendant's challenge to the jury array where the trial court found that Duplin County's black population is

34.02% and that the prospective jurors were only 24% black, but defendant failed to show what portion of the 34% black population was actually eligible to serve as jurors and therefore no correlation can be made between the total black population and the percentage of blacks in the venire.

**14. Constitutional Law § 60; Grand Jury § 3.3— selection of grand jury foreman— racial discrimination—not shown**

Defendant in a first degree murder prosecution did not make out a prima facie showing of racial discrimination in the selection of grand jury foremen where defense counsel's assertions were made based on his personal observations as a resident of the neighboring county and his conversations with Bladen County residents, from which the jury was drawn.

**15. Criminal Law §§ 42.4, 43.4, 60.1— murder—admission of photographs of victims, defendant's fingerprints and iron pipe—no error**

The trial court in a first degree murder prosecution did not abuse its discretion by admitting into evidence photographs and slides of the victims, defendant's fingerprints, and the iron pipe with which two of the victims were attacked. The photographs and slides, while sometimes gruesome, were relevant, corroborated testimony, and aided the pathologists' explanations of their opinions of the victims' cause of death; the fingerprint lifted from a victim's car matched defendant's and was clearly relevant; and the iron pipe was relevant to both the State's and defendant's case.

**16. Criminal Law § 87.1— prosecutor's questions of officer—not leading—no error**

The trial court in a first degree murder prosecution did not err by permitting a detective to testify that defendant had told him that a pipe which he had used to strike the victims was in the closet of his house where there was no suggestion of a desired response in the prosecutor's questions and the Supreme Court could not agree that the evidence was without foundation.

**17. Criminal Law §§ 77.3, 87.1, 90— murder—testimony by and concerning companion in crime—no error**

The trial court did not err during a first degree murder prosecution during the testimony of defendant's companion in crime by allowing a "flurry" of leading questions where the transcript reveals that there was but a single leading question, asked by the court to clarify a response to the prosecutor's nonleading question; by allowing the State to impeach its own witness because N.C.G.S. § 8C-1, Rule 607 permits impeachment of a party's own witness and the questions about the witness's prior criminal activity appear to have been asked in order to clarify the witness's testimony; by permitting the conditional introduction of a no deal written statement from the district attorney to the witness where the ruling was that the arrangement could not be introduced unless defendant mentioned it in his jury argument and neither the court nor the jury saw the statement; or by allowing a detective to read statements the witness made to law enforcement officers allegedly in violation of N.C.G.S. § 15A-927 because § 15A-927 applies only where a joint trial occurs, and because defendant himself brought the statements to the jury's attention.

**18. Homicide § 21.5— first degree murder—motion to dismiss—evidence sufficient**

The trial court did not err in a prosecution for three murders by denying defendant's motion for a directed verdict as to two of the murders for failure to prove premeditation and deliberation where a State's witness testified that he and defendant had discussed the necessity of "taking care of" one of the victims, that defendant had shown the witness an iron pipe prior to the victims' deaths and had directed the witness to use it on one of the victims; when the other victim, a child, awoke in the car, defendant told the witness that they would have to get rid of the little girl because she could testify against them; and defendant hit the little girl on the head with the pipe and threw her from the car into the water.

**19. Homicide § 25— three murders—simultaneous instructions—no error**

The trial court did not err in a prosecution for three first degree murders by instructing the jury on all three murders simultaneously where the final mandate clearly separated the three cases and the transcript nowhere revealed even a hint of an instruction directing the jury to consider the three murders as a common plan or scheme.

**20. Criminal Law § 114.1— murder—court's narrative of evidence—no error**

The trial court did not err in its narration of the evidence in a first degree murder prosecution where, although the summary of defendant's evidence was shorter than that of the State, it nevertheless clarified the issues and eliminated extraneous matters.

**21. Criminal Law § 113.1— murder—court's recapitulation of the evidence—no error**

The trial court did not err in a prosecution for three first degree murders by refusing defendant's request for clarification of testimony in certain areas where the court recapitulated the evidence to the extent necessary to explain the application of the law to the evidence. N.C.G.S. § 15A-1232.

**22. Homicide § 25— murder—instructions—no error**

The trial court did not err in a first degree murder prosecution by refusing to instruct the jury on the time span between two attacks on the victim by defendant and a State's witness where the evidence amply demonstrated that the two men acted together in harmony to rid themselves of a potential witness against them for another murder.

**23. Criminal Law § 111.1— murder—failure to instruct on placement of murder weapon on the clerk's desk—no error**

The trial court in a murder prosecution did not err by refusing to give an instruction on the placement of an iron pipe, the murder weapon, on the clerk's desk immediately in front of the jury, to allow defendant to photograph the desk, or to grant defendant a mistrial where the pipe was relevant and admissible and had previously been viewed by the jury; the pipe was placed in a position only two feet away from other trial exhibits, including several rifles and shotguns introduced by defendant; and the trial court found as a fact that the jurors had walked past the guns as well as the iron pipe on their way in

State v. McLaughlin

and out of the courtroom and had looked at them throughout the trial, not just on the morning of the court's jury charge.

**24. Criminal Law § 135.8— murder—aggravating factor—prior felony involving violence—properly submitted**

The trial court did not err in a prosecution for first degree murder by submitting to the jury the aggravating factor of prior conviction of a felony involving use or threat of violence to the person where defendant admitted under oath that he had been convicted of involuntary manslaughter and stipulated that the killing involved the use of violence. N.C.G.S. § 15A-2000(e)(3).

**25. Criminal Law § 135.8— murder—sentencing—aggravating factor of preventing lawful arrest—properly submitted**

The trial court in a prosecution for three first degree murders properly submitted the aggravating factor in two of the cases that the murders were committed to prevent lawful arrest. N.C.G.S. § 15A-2000(e)(4).

**26. Criminal Law § 135.8— murder—aggravating factor—pecuniary gain—properly submitted**

The trial court did not err in a prosecution for three first degree murders by submitting the aggravating factor of pecuniary gain. N.C.G.S. § 15A-2000(e)(6).

**27. Criminal Law § 135.8— murder—aggravating factor—especially heinous, atrocious or cruel—properly submitted**

The trial court did not err in a prosecution for first degree murder by submitting the aggravating factor that the murder was especially heinous, atrocious or cruel where evidence was elicited which tended to show that defendant beat the victim with an iron pipe, stuffed her mouth with a rag to stop her screaming, straddled her body and grabbed her by the throat, dragged her into the bathroom, forced her head under the water in the half-filled tub, and held it there while she struggled desperately for her life. Moreover, defendant was not in any event prejudiced since the jury made no finding on this factor and defendant did not receive the death penalty for this murder. N.C.G.S. § 15A-2000(e)(9).

**28. Criminal Law § 135.8— murder—aggravating factor—course of conduct—properly submitted**

The trial court did not err in a first degree murder prosecution by submitting the aggravating factor of course of conduct. N.C.G.S. § 15A-2000(e)(11).

**29. Criminal Law § 135.9— murder—mitigating factors—duress and parental obligations—not submitted—no error**

The evidence in a prosecution for three first degree murders was insufficient to require submission to the jury of the statutory mitigating factor of duress or domination of another person based on defendant's drug use or the nonstatutory factor of parental obligations where nothing in the transcript revealed that defendant was an excessive user of drugs or alcohol which might have brought him under an accomplice's influence in committing the murders

and the only evidence of parental obligation was the testimony of defendant's mother that defendant's daughter lived with her and that defendant visited her and brought her gifts. N.C.G.S. § 15A-2000(f)(5) and (9).

**30. Criminal Law § 135.7— murder—instructions on aggravating and mitigating factors**

The trial court did not err in a prosecution for three first degree murders by including an instruction on the recommendation sheet that the jury should indicate death as the appropriate punishment if it should find that the aggravating factors outweighed the mitigating factors and were, when considered with the mitigating factors, sufficiently substantial to call for the death penalty.

**31. Criminal Law § 135.7— murder—sentencing—issues on verdict sheet—no error**

There was no error in a prosecution for first degree murder in the issues as submitted to the jury where there was compliance with *State v. McDougall*, 308 N.C. 1.

**32. Jury § 9— murder trial—replacement of distraught juror—no abuse of discretion**

The trial court did not abuse its discretion in a murder prosecution by removing a distraught juror between the guilt and sentencing phases where the juror was the only black female on the jury; she began crying uncontrollably on the morning the sentencing phase began; she told the judge she felt incapable of remaining on the jury but did not think the prospective sentencing phase was the cause of her condition; the court immediately excused the juror without asking her to go to another room and compose herself; the juror was replaced with the first alternate, a white male; and the replaced juror was returned to the jury room.

**33. Criminal Law § 135.6— murder—sentencing phase—introduction of prior conviction for involuntary manslaughter—no error**

The trial court did not err during the sentencing phase of a murder prosecution by admitting defendant's conviction for involuntary manslaughter. N.C.G.S. § 8C-1, Rule 403 (1986); N.C.G.S. § 15A-2000(e)(3).

**34. Constitutional Law § 80— death penalty—constitutional**

North Carolina's death penalty statute is constitutional. N.C.G.S. § 15A-2000.

**35. Criminal Law § 111.1— murder—jury instructions—comment to press—no error**

The trial court did not err in its jury instructions in the sentencing phase of a first degree murder prosecution by commenting that the news media would be allowed to look at a copy of the issues and punishment recommendation sheet.

**36. Criminal Law §§ 113.9, 118.4— murder—denial of request to correct jury instructions—no error**

The trial court did not err in the sentencing hearing for three first degree murders by denying defendant's requests to "correct" the jury instructions where the trial court did in fact give a suggested additional instruction in some instances; it had already given a proper instruction in others; and in some cases the trial court properly found no basis for defendant's dissatisfaction.

**37. Criminal Law § 135.4— murder—sentencing—motions for life sentence and mistrial denied—no prejudice**

There was no prejudice in the sentencing phase for three first degree murders from the denial of defendant's motions for a mistrial and a life sentence where defendant's motion for a life sentence came after the jury had deliberated for seven hours but the three murders together required the consideration of nine aggravating and eighteen mitigating factors, and defendant did not in fact move for a mistrial but for the imposition of life sentences in two of the cases, which was the result imposed by the jury in both cases.

**38. Criminal Law § 113.7— murder—instruction on acting in concert—no prejudice**

There was no prejudice in a prosecution for three first degree murders where the jury foreman asked the court during the sentencing phase for an explanation of acting in concert and the judge replied that he would be happy to explain the concept after the jury completed deliberations on defendant's punishment. The trial court had ample evidence before it to warrant the acting in concert instruction and the instruction on the concept was proper in all respects.

**39. Criminal Law § 101.4— murder—jury deliberations—statement by juror in open court—no prejudice**

There was no prejudice in a prosecution for three first degree murders where the transcript reveals that the jury had some difficulty completing the sentencing forms in two of the cases, the foreman was explaining the difficulty to the court when a juror asked permission to speak, and the juror then clarified the foreman's explanation. Even if this was error, there was no prejudice because defendant received a life sentence in both cases.

**40. Criminal Law § 101.3— murder—jury deliberations—request to see an exhibit denied—no prejudice**

There was no prejudice in a prosecution for three first degree murders from the court's misstatement of the law where the jury asked to see an exhibit and the court informed the jury that it could only view exhibits during the trial while sitting together in the jury box. The jury did not unequivocally demand to see the particular exhibit and defendant failed to object to the trial court's statement. N.C.G.S. § 15A-1233(b); N.C.G.S. § 15A-1446.

**41. Criminal Law § 126— murder—sentencing—polling of jury**

There was no error in a prosecution for three first degree murders where the jury originally returned a death sentence in all three cases but one juror recanted her decision in two of the cases and the court refused to allow de-

State v. McLaughlin

fendant to poll that juror again as to a decision in the third case, refused to allow defendant to repoll the entire jury, denied defendant's motion for further deliberation, and refused to allow the recanting juror's request to speak. The juror who recanted her decision in two of the cases was polled on the third case twice and neither a further polling nor an individual rationale for her decision to recant in the two cases was necessary. The jury had reached a unanimous verdict in its recommendation of the death penalty for the third murder and there was no reason for further deliberation; moreover, a trial court has no authority to change a jury's sentence recommendation.

**42. Criminal Law §§ 101, 135.7— murder—trial court's dealing with jury—no error**

There was no error in a prosecution for three first degree murders where the jury was not allowed to add comments to the punishment blanks in the verdict sheets; the trial court's individual conversation with the jury foreman when handing him the verdict sheets out of the presence of the other jurors was entirely innocuous; the court's statement to the jury that the trial would have to await the recovery of any sick juror before proceeding was not prejudicial since one juror had already been excused because of incapacitation and no other juror requested removal or showed any evidence of illness during deliberations; and the trial court properly instructed the jury that it had to fill in and answer all the aggravating factor blanks but could leave the mitigating factor blanks empty if it did not find the facts by preponderance of the evidence. N.C.G.S. § 15A-2000(b); N.C.G.S. § 15A-1446.

**43. Criminal Law § 135.9— murder—requirement of unanimity of jury in finding mitigating circumstances—no error**

There was no error in a first degree murder prosecution from the nature of the charge, the required verdict sheets, and the required considerations of elements and factors based on *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384.

**44. Criminal Law § 159.1— murder—delay in preparing transcript—meaningful appellate review not precluded**

Although the court reporter took eighteen months to prepare the transcript of a trial for three murders, and the transcript was not a model of reporting service, it was not so inaccurate as to prevent the Supreme Court's reviewing it for errors in defendant's trial.

**45. Criminal Law § 135.10— murder—sentence of death—not disproportionate**

A sentence of death was not disproportionate and was fully supported by defendant's violent history as well as his brutality and calculation in killing and disfiguring his victim and his total lack of remorse as shown by his further murders of the victim's wife and child.

Justice FRYE dissenting as to sentence.

Chief Justice EXUM joins in this dissenting opinion.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from the imposition of a sentence of death and two life sentences, to

run consecutively, upon defendant's conviction of three separate charges of first-degree murder entered by *Hobgood, Hamilton H., J.*, at the 10 September 1984 special term of Superior Court, BLADEN County. Heard in the Supreme Court 8 February 1988 and 22 August 1988.

*Lacy H. Thornburg, Attorney General, Elizabeth G. McCrodden, Associate Attorney General, Joan H. Byers, Special Deputy Attorney General, James J. Coman, Senior Deputy Attorney General, and William N. Farrell, Jr., Special Deputy Attorney General, for the State.*

*T. Craig Wright, Michael W. Willis, Malcolm Ray Hunter, Jr., Appellate Defender, and Louis D. Bilionis, Assistant Appellate Defender, for defendant-appellant.*

*E. Ann Christian and Robert E. Zaytoun for North Carolina Academy of Trial Lawyers, and John A. Dusenbury, Jr., for North Carolina Association of Black Lawyers, amicus curiae.*

MEYER, Justice.

These three cases arise from a contract murder which spawned two further murders committed in an effort to eliminate witnesses and evade justice.

James Elwell Worley was killed on 26 March 1984. Little more than a month later, on 29 April 1984, his wife, Shelia Denise Worley, and her daughter, Psoma Wine Baggett, were killed. The State's evidence tended to show the following events. Sometime before 26 March 1984 defendant approached an acquaintance, Eddie Carson Robinson (who testified for the State at defendant's trial), about an offer defendant had received from Shelia Denise Worley to "take care of her husband" for between $3,000 and $5,000. Defendant offered to split the money with Robinson if Robinson would help him by driving a car. Robinson agreed to the scheme.

According to Robinson, the men were obliged to abandon their first attempt on James Worley's life, but two nights later, equipped with a .22-caliber rifle, a piece of pipe and a container of gasoline, they returned in defendant's car to Worley's house and parked on the dirt road. As the men approached Worley's house on foot, Robinson carried the rifle and defendant carried the pipe.

They entered the house by the back door, went into a hallway and saw James Worley asleep in a bedroom. Defendant took the rifle from Robinson and in the presence of Worley's wife, Denise, shot Worley twice in the left chest from a distance of between two and three feet, killing him.

With Denise Worley's help, defendant and Robinson dressed Worley's corpse and placed it on the passenger seat of Worley's Volkswagen. With Robinson following in the Volkswagen, defendant drove away from the house in his own car. Eventually, both cars stopped on the side of the road. Robinson then poured the container of gasoline into the Volkswagen and onto Worley, and ignited it. At approximately 2:00 a.m. on 26 March 1984 the still burning Volkswagen was discovered. Although Worley's body was badly burned all over, it showed greater charring on the left side. Dr. Deborah L. Radische, a pathologist from the Office of the Chief Medical Examiner, testified that James Worley died from the gunshot wounds to his chest.

According to Robinson, after James Worley's death, defendant and Robinson were in contact, but the latter received no money for his part in the killing. The two men discussed the situation and the fact that, according to defendant, Denise Worley had been talking to the police. By Robinson's account, defendant was afraid that, because Denise Worley was a witness to the killing, she could put both men in the penitentiary.

On the afternoon of 29 April 1984, defendant and Robinson decided to kill Denise Worley that night. The men spent the afternoon at defendant's trailer, smoking marijuana and drinking a little wine. Denise Worley visited the trailer, had a discussion with defendant and left. She returned that night, with her two children, four-year-old Psoma Wine Baggett and an infant. When Denise Worley arrived, Robinson was in the back bedroom, but he moved to the bathroom on defendant's instructions, where he picked up the iron pipe which defendant had instructed him to use in the killing. After defendant had turned off the lights and was holding Denise Worley in a romantic pose, Robinson crept out of the bathroom and twice hit her over the head with the pipe. According to Robinson, Denise Worley fell backwards into the hallway, whereupon defendant straddled her, grabbed her by the throat and dragged her to the bathroom. Defendant placed

Denise Worley into the half-filled bathtub and held her head under water until she stopped struggling. The men then cleaned up the blood from the bathroom and hallway floors, removed Worley's body from the bathtub and placed it in the trunk of her car. They returned to the house to get the two children who were asleep and put them into Worley's car.

With Robinson driving Denise Worley's car and defendant driving his own, the two men drove to a field not far from a bridge at a place called White's Creek. As they opened the trunk of Worley's car, the four-year-old, Psoma Wine Baggett, awoke and got out of the car. Defendant told Robinson that they would have to get rid of the child because she could testify against them. When Psoma walked to the back of the car asking for her mother, defendant struck her twice with the iron pipe. Defendant then removed Denise Worley from the trunk of the car and put her in the passenger side. Psoma was put on the floor on the passenger side. As the child lay there, defendant gave the pipe to Robinson and told him to hit her. Robinson did so. Defendant drove his own car and Robinson drove Worley's car to the bridge. Robinson got out of Worley's car and let it roll down the embankment into the creek. Defendant then pulled Denise Worley halfway out of the car so that her head and torso were in the water. He threw Psoma several feet from the car into the water. As the men left the creek, Robinson could hear a crying sound. The infant was left in the car physically unharmed.

Dr. John Butts, forensic pathologist and then-Associate Chief Medical Examiner for North Carolina, who performed the autopsy on Denise Worley, testified that in his opinion, Denise Worley had died as a result of drowning as well as trauma to the head, but that she was still alive when she entered the water. Dr. Deborah L. Radische testified that in her opinion, Psoma Wine Baggett died from the trauma to her head as well as drowning and, like her mother, she was still alive when she entered the water.

Detective Phillip Little of the Bladen County Sheriff's Department testified that on 9 May 1984, Eddie C. Robinson gave him a statement, in which he admitted that he had driven Denise Worley's car but that his involvement began only after Denise's body had been placed in the trunk. On 10 May 1984, Robinson made a second statement, in which he described how he had hit

Denise Worley with the pipe and how defendant had held her head under water until she ceased struggling. Also on 10 May 1984, defendant himself made a statement to Detective Little. Defendant acknowledged that he had agreed to help Denise Worley by killing her husband and that he had gone to the Worley home where he had shot James Worley twice. He further stated that Denise Worley had died at defendant's trailer after she and defendant had argued and fought with the iron pipe. Although Robinson was not present during the argument, he had helped defendant to dispose of Denise Worley's body. Defendant stated that he had struck the first blow to Psoma Wine Baggett and Robinson had hit her twice more.

Defendant took the stand on his own behalf. He testified that although Denise Worley had approached him about killing her husband for money, he had refused the offer, but had arranged to meet her at Worley's home. When he entered the home by the back door with Robinson, defendant could see Denise Worley and could tell from her actions that something was wrong. He then saw James Worley moving in the bedroom, so he snatched the rifle from Robinson and shot Worley twice to protect himself, even though he saw no weapon on Worley. After dressing the corpse, Robinson drove Worley's Volkswagen and defendant drove his own car to the field where Robinson poured gasoline onto the Volkswagen and ignited it.

Defendant further testified that on the day Denise Worley was killed, she had visited defendant at his trailer and had become upset because she suspected defendant of having another woman there. She left the trailer, but later returned with her two children. She and defendant argued. Denise Worley pulled the iron pipe from the trunk of her car and hit defendant's arm with it, whereupon defendant became angry, took the pipe from Denise and hit her with it. Defendant took the pipe into his trailer, but Denise followed him and when she grasped defendant around the waist, he used the pipe to hit her again. While defendant treated his arm wound, Robinson took the pipe and hit Denise as she was rising from a chair. After she fell to the floor, Robinson hit her a second time. As Denise lay bleeding, defendant put a rag into her mouth to stop her screaming. Defendant and Robinson removed the children from Denise's car and put them in the trailer while they moved Denise to the trunk of her car. After cleaning up the

blood, the men put the children back into the passenger compartment of Denise's car. Defendant drove his own car, with Robinson following in Denise's car, to a field. Defendant testified that as the men were moving Denise's body from the trunk, Psoma awoke. Defendant was holding the pipe, but he was trying to protect Psoma from Robinson. The pipe slipped and fell, hitting the child. Defendant put the child and the pipe in the car, and when Psoma started screaming, Robinson hit her twice on the head with the pipe. Defendant and Robinson then drove the cars to the creek, where Denise's vehicle was rolled into the water.

On cross-examination of defendant, it was established that defendant had previously been convicted of involuntary manslaughter, possession of a controlled substance, driving under the influence, auto larceny and various motor vehicle law violations. Two witnesses testified to defendant's good character and reputation in the community.

The jury found defendant guilty of first-degree murder in all three cases. At the sentencing phase of the trial, defendant stipulated that he had previously been convicted of involuntary manslaughter and that the act involved the use of violence. Defendant then put on further evidence of his good character and reputation in the community, as well as his reputation for honesty. The State presented rebuttal evidence of defendant's bad reputation.

In the James Worley case, the jury found two aggravating factors and three mitigating factors. In the Denise Worley case, the jury found three aggravating factors and three mitigating factors. In the Psoma Baggett case, the jury found three aggravating factors and two mitigating factors. It then unanimously found beyond a reasonable doubt that the aggravating factors when considered with the mitigating factors were sufficiently substantial to call for the imposition of the death penalty in all three cases. However, when the verdicts were returned and the jury was polled, one juror recanted her vote as to the recommendation of the sentence of death in the cases of Denise Worley and Psoma Baggett. Therefore, pursuant to the jury's recommendation, the trial court sentenced defendant to death for the first-degree murder of James Worley and to two consecutive life sentences for the first-degree murders of Denise Worley and Psoma Baggett.

State v. McLaughlin

Defendant brings forward one hundred sixty-one assignments of error covering both the guilt-innocence and sentencing phases of his trial. Contrary to the North Carolina Rules of Appellate Procedure and acceptable practice, defendant does not group his exceptions under single assignments of error, but rather chooses to make a separate issue of each exception. N.C.R. App. P. 10(c) (1986). Though our task is complicated by this disregard for the rules, we will address defendant's one hundred sixty-one issues, in group form where appropriate.

I. PRETRIAL PHASE

Defendant first finds fault with the handling of sixteen pretrial matters. He contends specifically that the trial court erred in (1) denying his motion to retain jurisdiction, (2) overruling his objection to the introduction of the State's psychiatric report in the pretrial determination of defendant's competency to proceed, (3) denying his motion for funds to hire an investigator, (4) denying his motion for a bill of particulars of aggravating factors to be submitted at the sentencing phase, (5) denying his motion for a list of the State's witnesses, (6) denying certain items of defendant's *Brady* motion, *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed. 2d 215 (1963), (7) refusing to continue the hearing of his motion to suppress, (8) refusing to suppress defendant's statements to law enforcement officers, (9) denying defendant's motion to suppress a search warrant and its fruits, (10) denying his motion for an independent psychiatric examination, (11) refusing to sequester the jurors at night, (12) denying defendant's motion for individual voir dire of prospective jurors, (13) denying his motion to continue the trial, (14) denying his motion to provide funds for a jury selection expert, (15) denying his motion to prohibit the death qualification of the jurors, and finally, (16) denying his challenge of the jury array. We address these pretrial matters *seriatim,* ultimately finding no error in any of them.

[1] On 31 May 1984, defendant filed a motion to have the trial judge retain jurisdiction over all matters pertaining to his trial. This motion was denied. Defendant now argues that because his was a complicated case, the due process requirements of the fifth amendment to the United States Constitution and article I, section 19 of the North Carolina Constitution require that the same judge hear all pretrial motions and other procedural matters as

well as preside over the trial itself. Our research reveals no case which holds that a constitutional right exists to the retention by one judge of all matters pertaining to a trial, whether complicated or straightforward, and defendant cites us to none. This argument is without merit.

[2] On 19 May 1984 defendant filed a pretrial motion for a psychiatric evaluation of his sanity as well as his mental condition and capacity at the time of the crimes. This evaluation was performed by Dr. Patricio Lara of Dorothea Dix Hospital. Dr. Lara's report was introduced into evidence at a pretrial hearing to determine defendant's competency to stand trial. Defendant now argues that the report was erroneously admitted because his motion for an independent psychiatric examination was erroneously denied. He directs our attention to a later assignment of error, in which he contends that the court-ordered evaluation by Dr. Lara was totally inadequate because the psychiatrist saw him for no more than thirty minutes and because the report addressed only the question of defendant's competency to stand trial. Defendant's arguments are unpersuasive. We note initially that defendant failed to object to the report's introduction at the competency hearing. The limited use of the report to determine defendant's competency to stand trial is not error. *See Buchanan v. Kentucky,* 483 U.S. ---, 97 L.Ed. 2d 336 (1987). Defendant himself questioned Dr. Lara at trial on this issue. Moreover, although a constitutional right to provision, by the State, of a psychiatrist exists when a defendant has made an ex parte threshold showing that his sanity at the time of the crime is likely to be a significant factor in his defense, *Ake v. Oklahoma,* 470 U.S. 68, 84 L.Ed. 2d 53 (1985), such defendant must show a particularized need for the psychiatrist. *State v. Gambrell,* 318 N.C. 249, 347 S.E. 2d 390 (1986); *State v. Penley,* 318 N.C. 30, 347 S.E. 2d 783 (1986). His motion to the court contained no such showing; it seems to relate only to the establishment of mitigating circumstances, i.e., it made only a bare assertion that an independent evaluation was needed to address "questions which would tend to mitigate the alleged conduct of the Defendant, specifically the questions of whether the alleged crimes were committed while the Defendant was under the influence of any mental or emotional disturbance and whether the capacity of the Defendant to appreciate the criminality of his alleged conduct and to conform his conduct to the requirements of law was impaired."

Dr. Lara testified at trial that his examination of defendant lasted approximately two weeks, during which he could recall two "long interviews" with defendant. The record contains no evidence that defendant was emotionally disturbed or unable to conform his conduct to the requirements of law. Defendant failed to show a particularized need for a second independent psychiatric evaluation at the State's expense. These assignments of error are overruled.

[3] Defendant next contends that the trial court erred in initially denying his motion for funds with which to hire an investigator, thus denying him access to the "tools of defense." *Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859 (1976). We disagree. Although the State must provide legal counsel and "other necessary expenses of representation" to indigent defendants, N.C.G.S. § 7A-450(b) (1986), the decision to provide an investigator pursuant to the statute rests within the trial court's discretion and will not be disturbed absent a showing of abuse of that discretion, *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981). We noted in *Gardner* that "the appointment of private investigators should be made 'with caution and only upon a clear showing that specific evidence is reasonably available and necessary for a proper defense,' since '[t]here is no criminal case in which defense counsel would not welcome an investigator to comb the countryside for favorable evidence.'" *State v. Gardner*, 311 N.C. at 499, 319 S.E. 2d at 598 (quoting *State v. Tatum*, 291 N.C. 73, 82, 229 S.E. 2d 562, 568 (1976)). Defendant made no clear showing here. Nevertheless, the trial court advised defendant's two attorneys that if they encountered problems, they could return to the court and so advise it. They did not do so. Defendant has failed to demonstrate error. *See State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987).

[4] Defendant next contends that his motion for a bill of particulars on the aggravating factors to be offered during the sentencing phase of his trial was erroneously denied, so that he was deprived of due process of law. We have held that a defendant is not constitutionally entitled to an enumeration of aggravating factors to be used against him: statutory notice as contained in N.C.G.S. § 15A-2000(e) is sufficient. *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d

1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). Defendant goes on to argue that he was also denied due process of law because he was not provided with a list of the State's witnesses. We have held that a defendant is not entitled to such a list. *State v. Alston*, 307 N.C. 321, 335, 298 S.E. 2d 631, 641 (1983). This rule applies to capital cases. *State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987). These assignments of error are overruled.

[5]   Defendant's next assignment of error concerns his motion for discovery of certain information pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed. 2d 215 (1963). He argues that four items were unconstitutionally denied him. These included (1) the names and addresses of all persons interviewed by the State, with copies of their statements; (2) the total list of all persons interviewed in the entire investigation, with accounts of the interviews and the names of the interviewers; (3) a detailed list of the criminal records of all State witnesses; and (4) all written reports, documents or physical evidence in the possession of the State or the prosecution relative to defendant's case or its investigation. The State asserts that none of the items are subject to discovery, because they are either the "work product" of investigators or simply not discoverable under any relevant statute. We agree. In *State v. Alston*, 307 N.C. 321, 335-36, 298 S.E. 2d 631, 641, we held that the trial court did not have the authority to order the State to disclose to defendant either the names of the State's witnesses or the statements of all persons interrogated or interviewed during the investigation. N.C.G.S. § 15A-903(d), -904(a) (1986). Additionally, no statutory provision or constitutional principle requires the trial court to order the State to make available to a defendant all of its investigative files relating to his case or the names of all agents who participated in the investigation, N.C.G.S. § 15A-903(d) (1986), or to disclose the criminal records of the State's witnesses. *State v. Alston*, 307 N.C. at 336-38, 298 S.E. 2d at 643. Defendant's assignment of error in this regard is overruled.

[6]   By his next assignment of error, defendant argues that the trial court erred in refusing to continue the hearing of his motion to suppress certain evidence. Defendant maintains that his two counsel needed more time to prepare for the hearing and that he was thereby denied due process of law. This argument is without merit. Defendant failed to argue a due process right in either his written or oral motion. Even had he not thus waived the constitu-

tional argument, *State v. Mitchell,* 276 N.C. 404, 172 S.E. 2d 527 (1970), he has utterly failed to show in what manner the trial court's refusal to continue the case prejudiced him. This assignment of error is overruled.

[7] Defendant next contends that the trial court erred in refusing to suppress the two statements defendant made to law enforcement officers on 9 and 10 May 1984. Specifically, he argues that his statements were not given voluntarily, considering the totality of the circumstances (for example, the interviewing officers were armed, defendant had not had much sleep, had worked a full shift and had indulged in alcohol and drug use some time prior to his arrest). We cannot agree with defendant's contention. The trial judge's order contains extensive findings of fact which show that at the time defendant made his two statements, he had been fully advised of and had waived his constitutional rights. He was coherent, appeared not to be under the influence of alcohol or drugs and showed no desire to stop talking or request an attorney. The interviewing officers made no threats against defendant, nor did they make him any promises in return for his statements. We note that defendant failed to except to any of the trial judge's findings of fact. When no exceptions are made to individual findings of fact, they are presumed to be supported by competent evidence. *State v. Allen,* 322 N.C. 176, 367 S.E. 2d 626 (1988); *State v. Perry,* 316 N.C. 87, 340 S.E. 2d 450 (1986). The findings here support the trial judge's conclusion that defendant voluntarily, knowingly and intelligently waived his constitutional rights.

[8] Defendant goes on to argue that the search warrant for his home and automobile did not satisfy the requirements of N.C.G.S. § 15A-244 (which lists the matters every search warrant application must contain) and that its fruits should therefore have been suppressed. We disagree. Defendant failed to except to any of these findings of fact. *See State v. Allen,* 322 N.C. 176, 367 S.E. 2d 626; *State v. Perry,* 316 N.C. 87, 340 S.E. 2d 450. Once again, the trial court's order contains thorough findings of fact supporting its conclusion that the search warrant met the N.C.G.S. § 15A-244 standard. Defendant also argues that the search warrant itself did not satisfy N.C.G.S. § 15A-246(2) because it did not contain the name of a specific officer or classification of officers to whom the warrant was addressed. Having failed to raise this is-

sue for the trial court's consideration, defendant may not raise it for the first time at the appellate level. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). Defendant's assignments of error concerning the search warrant and its fruits are overruled.

[9] Defendant next argues that he was prejudiced because the trial court did not require the jurors to be sequestered at night during his trial. He contends that the extensive newspaper and television publicity surrounding his trial mandated sequestration. We do not agree. Under N.C.G.S. § 15A-1236(b), the trial judge has discretion to order a jury's sequestration. In defendant's case, the jury was selected from citizens of another county. The trial court quite frequently admonished the jury against discussing the case or gaining information about it from outside sources. Defendant presented no evidence that the jury did anything other than follow the trial court's orders. He has failed to show prejudice. N.C.G.S. § 15A-1443(a) (1986). In addition, defendant argues that the trial court erred in denying his motion for voir dire of individual prospective jurors out of the presence of other jurors. He maintains that this denial made it impossible for him to question individual jurors about their knowledge of his case without educating the rest of the jury panel about it. *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776 (1968); N.C.G.S. § 15A-1214(j) (1986). We conclude that defendant's argument is speculative at best. *See State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979) (argument that collective voir dire makes all jurors aware of prejudicial and possibly incompetent evidence, thereby rendering selection of impartial jury impossible is mere speculation). *See also State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987). These assignments of error are rejected.

[10] Defendant next contends that the State should not have been permitted to "death qualify" the jury. Though defendant does not cite us to authority, we assume from his argument that he again buttresses his contention with *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776. Even so, defendant's argument is without merit. The United States Supreme Court has held that the United States Constitution does not prohibit states from "death qualifying" jurors in capital cases, since the procedure is "carefully designed to serve the State's concededly legitimate in-

terest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *Lockhart v. McCree*, 476 U.S. 162, 175-76, 90 L.Ed. 2d 137, 149 (1986). *See also Buchanan v. Kentucky*, 483 U.S. ---, 97 L.Ed. 2d 336 (1987). This Court has so held. *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986); *State v. King*, 316 N.C. 78, 340 S.E. 2d 71 (1986); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). We note that in defendant's case the State challenged eight potential jurors for cause because all expressed their inability to follow the court's instructions on imposition of the death penalty. At least one juror opposed to the death penalty remained on the jury because she indicated that she *could* follow the court's instructions. Several more were successfully challenged for cause because they thought that the death penalty should be automatic. Defendant's arguments as to "death qualifying" the jurors is rejected.

[11]    On 16 August 1984 and 5 September 1984, defendant made a motion to continue his trial, which the trial court denied. Defendant now claims prejudice. Since defendant did not except to the findings of fact or conclusions of law in the trial court's order, they are not properly the basis of an assignment of error on appeal. N.C.R. App. P. 10(a). However, we conclude that the order of denial is supported by the conclusions of law which are in turn supported by the findings of fact. Defendant had two attorneys representing him for four months. A one-week absence by one attorney to attend to his sick relative is not a significant period in what amounts to eight man-months of trial preparation time. Defendant's claim of prejudice is without merit.

[12]    Next, defendant argues that he was deprived of effective assistance of counsel, contrary to his sixth amendment rights, because the trial court refused to allocate him funds for a jury selection expert. As he did when arguing for an independent psychiatric examiner, defendant here failed to show a particularized need for expert assistance. Defendant's motion gave no reason why he needed such assistance. *State v. Artis*, 316 N.C. 507, 347 S.E. 2d 847 (1986) (denial of indigent defendant's request for jury selection expert upheld because no showing of particularized need). *See also State v. Hickey*, 317 N.C. 457, 342 S.E. 2d 646

(1986); *State v. Penley*, 318 N.C. 30, 347 S.E. 2d 783 (1986). This assignment of error is rejected.

[13] Defendant's final contention in the area of pretrial matters is that the trial court erred in denying his challenge to the jury array. Specifically, he argues that he made a prima facie showing that blacks had been excluded from the jury pool and that the burden of proof should then have shifted to the State to show that the jury selection process in Duplin County for defendant's trial was not discriminatory. *State v. Lowry*, 263 N.C. 536, 139 S.E. 2d 870 (1965). Defendant's argument is based on the trial court's finding that Duplin County's black population is 34.02% and that the prospective jurors were only 24% black. Defendant is black and so were his three victims. Since the State offered no competent evidence of nondiscrimination, defendant contends that the trial court should have ruled that the jury array was improper. We disagree.

A defendant has a constitutional right to be tried by a jury from which members of his own race have not been systematically and arbitrarily excluded. He does not, however, have a constitutional right to be indicted or tried by a jury of his own race or even to have a representative of his race on the petit jury. *State v. Brower*, 289 N.C. 644, 653, 224 S.E. 2d 551, 558 (1976), *motion for reconsideration denied*, 293 N.C. 259, 243 S.E. 2d 143 (1977). The burden is upon the defendant to show a prima facie case of racial discrimination. *Id.* In the case *sub judice*, defendant has failed to show that the jury selection procedure was not racially neutral or that there is a history of relatively few blacks serving on Duplin County juries. According to defendant's statistics, 34% of Duplin County's population is black. Of the 78 prospective jurors, only 24% were black. Defendant has failed to show, however, what portion of the county's 34% black population is actually eligible to serve as jurors. Therefore no correlation can be made between the total black population and the percentage of blacks in the venire. The record brought forward by defendant is insufficient to make out a prima facie case of racial discrimination. *State v. Brower*, 289 N.C. 644, 224 S.E. 2d 551 (evidence insufficient where blacks approximately 11% underrepresented on venire from which petit jury drawn). *See also State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980). Defendant's assignment of error is overruled.

**[14]** At this point, we turn to defendant's motion to amend the record on appeal, filed one week before oral argument on his case. We reserved our ruling on the motion until after the case was argued. The motion contains defendant's contention that his indictments stemmed from a grand jury in which the selection of the foreman was racially exclusive of blacks. We permitted defendant to address the issue at oral argument. Defendant's motion is based on *State v. Cofield*, 320 N.C. 297, 357 S.E. 2d 622 (1987), in which we held that where racial discrimination in the selection of the foreman of the grand jury which indicted the defendant can be demonstrated, the defendant's indictment will be vitiated and the judgment against him arrested. *Id.* at 304, 357 S.E. 2d at 626-27. A defendant can make out a prima facie case by showing either (1) that the selection procedure itself was not racially neutral, or (2) that for a substantial period in the past relatively few blacks have served in the position of foreman even though a substantial number have been selected to serve as members of grand juries. *Id.* at 308-09, 357 S.E. 2d at 629. Cofield met the second test by having the Superior Court Clerk testify as to the racial composition of the county as well as the number of blacks appointed as grand jury foremen during the Clerk's long tenure, which testimony was supported by the Clerk's records. Defendant McLaughlin made no such motion at trial and his counsel admitted on oral argument before this Court that no materials had been prepared on grand jury foremen appointments in Bladen County, but stated that he "believed" a *Cofield* situation to exist based on his personal observations as a resident of the neighboring county and his conversations with Bladen County residents. Counsel requested on behalf of defendant that the case be remanded to the trial court for determination as to whether a *Cofield* situation did in fact exist. We decline to remand based on such bare assertions of counsel's personal beliefs. Defendant's motion is denied.

## II.  GUILT-INNOCENCE PHASE

**[15]** Defendant first brings forward ten assignments of error relating to the admission into evidence of photographs and slides of the three victims, the expert opinion testimony as to the cause of death, defendant's fingerprints and the iron pipe with which Denise Worley and Psoma Baggett were attacked. Defendant makes one general argument that the evidence and testimony

about which he complains was inadmissible under Rule 403 of the North Carolina Rules of Evidence, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1986). Defendant complains that the prejudicial effect of the evidence and testimony outweighed their relevancy. We disagree.

We address these ten assignments of error as one group. We note initially that the exclusion of evidence under the Rule 403 weighing test is a matter within the sound discretion of the trial court. *State v. Mason*, 315 N.C. 724, 340 S.E. 2d 430 (1986). We have carefully scrutinized each of the items of evidence and transcript testimony which defendant argues should have been excluded. We find no error. The photographs and slides, while sometimes gruesome, were relevant, corroborated State witness Robinson's testimony, and aided the pathologists' explanations of their opinions on the victims' cause of death. "Photographs are usually competent to be used by a witness to explain or illustrate anything that is competent for him to describe in words." *State v. Watson*, 310 N.C. 384, 397, 312 S.E. 2d 448, 457 (1984). Gruesomeness alone does not render a photograph or slide incompetent. *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579 (1979).

As to the several instances of allegedly prejudicial testimony, they were either relevant for corroboration purposes, or as clarification of an expert opinion as to cause or instrumentality of death. The fingerprint lifted from Denise Worley's car matched that of defendant on the fingerprint card—clearly relevant evidence. Finally, the iron pipe was relevant, not only to the State's case as the weapon used to hit Denise Worley and Psoma Baggett, but also to defendant's testimony that it slipped from his hand and hit Psoma accidentally. We conclude that defendant has failed to show that the trial court abused its discretion in allowing these items of evidence to be introduced and this testimony to be elicited.

[16] Defendant's next assignment of error relates to the statement he gave to Detective Little. At trial, the officer read defendant's statement and then answered questions put to him by the prosecutor. The transcript reveals the following:

Q. All right, so now during the time that you took that statement, did you have occasion to ask Mr. McLaughlin about the pipe?

A. Yes, sir.

Q. And what, if anything, did he tell you about the pipe?

MR. WILLIS: Objection.

THE COURT: Overruled.

A. Uh, McLaughlin told me that the pipe that he used to hit Denise and the child, Psoma, was in a closet near the front door of his mobile home.

The officer further testified that he went to defendant's home where he found the pipe. Defendant contends that by allowing the officer to rely on his memory of events and to testify to defendant's nonrecorded remarks, the trial court allowed the prosecutor to suggest the officer's answers to his questions. This information, argues defendant, was elicited without proper foundation. We are unable to discern any suggestion of a desired response in the prosecutor's questions, or to agree that they lacked sufficient foundation. The officer's testimony was to the effect that he used his recollection of what defendant had told him in order to search for and find the pipe. *See State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513. This assignment of error is without merit.

[17] Defendant's next four assignments of error concern his companion in crime, State witness Eddie Robinson. Defendant complains that he was prejudiced because the trial court allowed (1) the prosecutor to ask "a flurry" of leading questions of Robinson, (2) the State to impeach Robinson by questioning him about his prior criminal activity, (3) the conditional introduction into evidence of the "no deal" written statement from the district attorney to Robinson, and (4) Detective Little to read the statements Robinson made to law enforcement officers, allegedly in violation of N.C.G.S. § 15A-927. We disagree. First, our review of

the transcript reveals that defendant exaggerates—there was but a single leading question to which he excepted. It was asked not by the prosecutor, but by the trial court, and its purpose was to clarify a witness' response to the prosecutor's *non*leading question. Second, N.C.G.S. § 8C-1, Rule 607 permits impeachment of a party's own witness. The State questioned Robinson about his prior criminal activity only after defendant himself had elicited the testimony on cross-examination: the questions appear to have been asked in order to clarify Robinson's testimony on cross-examination. Third, the trial court ruled that the "no deal" arrangement between Robinson and the district attorney could not be introduced unless defendant mentioned it in his jury argument. Neither the court nor the jury saw the statement in question. Fourth, N.C.G.S. § 15A-927, relating to the statements of codefendants, does not apply in this case since, under the statute, restrictions are placed on the use of a codefendant's statement only where a joint trial occurs. N.C.G.S. § 15A-927(c)(1)(a), (1)(b) (1986). Robinson was not jointly tried with defendant. Moreover, here, the State could and did properly use Robinson's statements for corroboration purposes. One of the statements differed from Robinson's trial testimony. Since, however, defendant had cross-examined Robinson about this prior inconsistent statement, he cannot now claim prejudice when statements he himself had brought to the jury's attention were subsequently read to it by Detective Little. These four assignments of error are overruled.

[18] By his next assignment of error, defendant argues that his motion for a directed verdict in the cases of Denise Worley and Psoma Baggett should have been allowed because the State failed to prove premeditation and deliberation. Defendant here incorporates by reference more than one thousand pages of trial transcript to support his argument in addition to all applicable pages of the record. Defendant's argument fails.

The following definitions and principles of law apply. Premeditation means thought beforehand, for some length of time, however short. *State v. Hawkins*, 214 N.C. 326, 199 S.E. 284 (1938). Deliberation means the execution of an intent to kill in a cool state of blood, without legal provocation and in furtherance of a fixed design. *State v. Britt*, 285 N.C. 256, 204 S.E. 2d 817 (1974). In considering a motion to dismiss, the trial court must consider all the evidence in the light most favorable to the State. *State v.*

*Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). The test of the sufficiency of the evidence in a criminal case is whether there is substantial evidence of all elements of the offense charged so that a rational trier of fact could find beyond a reasonable doubt that the defendant committed the crime. *State v. Thompson*, 306 N.C. 526, 294 S.E. 2d 314 (1982). Applying these definitions and principles to the case *sub judice*, we find ample evidence of defendant's premeditation and deliberation in the murders of Denise Worley and Psoma Baggett. Robinson testified that he and defendant had discussed the necessity of "taking care of" Denise. Prior to Denise's death, defendant had shown Robinson the iron pipe and had directed the latter to use it on Denise. When the child Psoma awoke in the car, defendant told Robinson that they would have to "get rid of the . . . little girl, because she could testify against [them]." Robinson testified that defendant hit Psoma on the head with the iron pipe and then threw her from the car into the water. We conclude from this evidence that the trial court properly denied defendant's motion to dismiss.

Defendant now makes one general statement to the effect that under N.C.G.S. § 8C-1, Rule 402, the trial court erroneously refused to allow him to introduce relevant evidence but allowed the State to introduce irrelevant evidence. In a further forty-five issues, scattered through his brief, defendant refers us back to this general statement, apparently arguing that his objections at trial were improperly overruled. The State answers each issue separately and in detail. We have carefully read the appropriate passages in the transcript. We are unable to conclude that the trial court erred in any of its evidentiary rulings. These assignments of error are rejected in toto.

[19]  The next three issues defendant brings before us are to the effect that the trial court erred in denying defendant's motions (1) for dismissal of the charges against him at the end of all the evidence, (2) to set aside the three verdicts as against the greater weight of the evidence, and (3) for appropriate relief including a new trial. As to the first issue, defendant argues specifically that the court instructed the jury on all three murders simultaneously, thus presenting a view that the crimes were interrelated and part of a scheme or common plan. This, he asserts, led the jury to assume that if it found defendant guilty of one murder, then it would have to find him guilty of the other two. This assertion

commands no support from the transcript. Although the trial court instructed the jury on the murders simultaneously, the final mandate clearly separated the three cases. The transcript nowhere reveals even a hint of an instruction directing the jury to consider the three murders as a common plan or scheme. This assignment of error is overruled. As to the second and third issues, defendant refers us to his argument just made. It is similarly overruled.

[20] By his next assignment of error, defendant complains that the trial court presented a narrative of the evidence which failed to distinguish his contentions from those of the State. Defendant draws our attention to the contradictions in Robinson's testimony and his own, claiming that the trial court instructed the jury on a version of the facts which in places was inconsistent with both. We are unpersuaded. Under N.C.G.S. § 15A-1232 the trial court is not required to state the evidence except to the extent necessary to explain the application of the law to the evidence. This the trial court did. The transcript reveals that although the court's summary of defendant's evidence was shorter than that of the State, it nevertheless clarified the issues and eliminated extraneous matters. *State v. McClain*, 282 N.C. 396, 193 S.E. 2d 113 (1972); *State v. Jackson*, 228 N.C. 656, 46 S.E. 2d 858 (1948). We find no error in the narration of the evidence.

[21] Defendant next claims error by the trial court in refusing his request for clarification of testimony in three areas: (1) its refusal to instruct that Robinson admitted hitting both Denise Worley and Psoma Baggett and that he intended killing them; (2) its refusal to instruct on an evidentiary discrepancy concerning the location of Psoma's body in the creek; and (3) its refusal to instruct that the State's pathologist could not specify Denise Worley's cause of death. The State argues that (1) the trial court instructed that the evidence tended to show that Robinson hit Denise and Psoma; and nowhere does the record reveal an admission by Robinson of an intent to kill; (2) the discrepancy in the location of Psoma's body was for defense counsel to argue; and (3) the trial court's instructions reflected the pathologist's opinion that Denise Worley died of drowning and that the blows to her head would not have caused her death. We have carefully read the trial court's charge to the jury, and do not discern error. The trial court recapitulated the evidence to the extent necessary to

explain the application of the law to the evidence. *State v. Mc-Clain*, 282 N.C. 396, 193 S.E. 2d 113. These assignments of error are rejected.

[22]  We now address an issue that defendant chooses to present in the portion of his brief relating to the penalty phase of his trial, but which properly relates to the guilt-innocence phase. Defendant argues that the evidence at trial showed that a "rather substantial" time elapsed between his and Robinson's attacks on Denise Worley with the iron pipe, sufficient to eliminate the acting in concert theory, and that the trial court erred in refusing to instruct the jury on this point. This argument fails under *State v. Joyner*, 297 N.C. 349, 356, 255 S.E. 2d 390, 395 (1979), where we stated that acting in concert means "to act together, in harmony or in conjunction one with another pursuant to a common plan or purpose." Defendant's evidence was that after striking Denise Worley with the iron pipe as she attempted to hug him, he went to the bathroom to clean the arm wounds he had earlier sustained, told Robinson what had happened and then watched as Robinson hit Denise. This evidence amply demonstrates that the two men acted together in harmony pursuant to their agreed plan to rid themselves of a potential witness against them for the murder of James Worley. The trial court did not err in refusing to instruct the jury on the time span between the attacks on Denise Worley.

[23]  Defendant's next three assignments of error relate to the iron pipe used to attack both Denise Worley and Psoma Baggett, which was placed on the clerk's desk immediately in front of the jury. The trial court refused to give an instruction on the placement or to allow defendant to photograph the desk. It also denied his motion for a mistrial. Defendant now asserts that the district attorney placed the pipe in that position only for the purpose of inflaming the jury, so that defendant suffered prejudice. We are unpersuaded. The pipe was both relevant and admissible and had previously been viewed by the jury. *See State v. Joyner*, 301 N.C. 18, 269 S.E. 2d 125 (1980). The question therefore becomes whether the trial court abused its discretion in refusing to declare a mistrial. We conclude that it did not. The trial court has the discretionary power to order a mistrial, but such an order must be based upon an occurrence that renders a fair and impartial trial impossible. *State v. Crocker*, 239 N.C. 446, 80 S.E. 2d 243

(1954). The record shows that the iron pipe was placed in a position only two feet away from other trial exhibits, including several rifles and shotguns introduced by defendant. The trial court found as a fact that the jurors had walked past the guns as well as the iron pipe on their way in and out of the courtroom and had looked at them throughout the trial. We cannot conclude that the sight of the iron pipe, though separated from other exhibits on the morning of the trial court's jury charge, had such an inflammatory effect upon the jury that defendant suffered prejudice thereby. The trial court correctly refused to give an instruction on the pipe's placement, to allow defendant to photograph the clerk's desk or to declare a mistrial.

Finally, defendant complains about what he describes as the trial court's "unnecessary comments" during both phases of his trial. He gives us thirty-eight examples. None of these examples persuade us to defendant's view. The trial court's control of the trial was entirely proper. Defendant's assignment of error is rejected.

III. SENTENCING PHASE

[24] Defendant first directs our attention to several aggravating factors which he argues were erroneously submitted to the jury at the sentencing phase of his trial for the three murders. First, he argues that submission of the aggravating factor of a prior felony was inappropriate under N.C.G.S. § 15A-2000(e)(3). This is entirely without merit. The statute allows the jury to consider as an aggravating factor for sentencing purposes the fact that a defendant has been previously convicted of a felony involving the use or threat of violence to the person. *Id.* Defendant here admitted under oath that he had been convicted of involuntary manslaughter and stipulated that the killing involved the use of violence. This aggravating factor was properly submitted to the jury.

[25] Second, defendant argues that the aggravating factor of commission of the murder to prevent lawful arrest, N.C.G.S. § 15A-2000(e)(4), should not have been submitted in the cases of Denise Worley and Psoma Baggett. He contends that the evidence he presented tended to show that these two deaths were unrelated to the avoidance or prevention of arrest for the murder of James Worley. We conclude that the evidence was sufficient

for the submission of this factor. The State's witness, Robinson, testified that he and defendant schemed to kill Denise Worley to prevent her from exposing their involvement in James Worley's death. The evidence presented makes it clear that they then killed Psoma Baggett to prevent her from identifying them as the men who had murdered her mother, Denise Worley. This aggravating factor was properly submitted to the jury. *See, e.g., State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied,* 471 U.S. 1120, 86 L.Ed. 2d 267 (1985).

[26]    Third, defendant argues that the aggravating factor of murder for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), should not have been submitted in the cases of Denise Worley and Psoma Baggett. This is a meritless argument, since the factor was only submitted to the jury in the case of the murder of James Worley. As to this murder, the factor was properly submitted on the basis of Robinson's testimony that Denise Worley had offered to pay defendant money to murder her husband.

[27]    Fourth, defendant argues that the aggravating factor that the murder of Denise Worley was especially heinous, atrocious or cruel, N.C.G.S. § 15A-2000(e)(9), was improperly submitted to the jury. We do not agree. Evidence was elicited which tended to show that defendant beat Denise with the iron pipe, stuffed her mouth with a rag to stop her screaming, straddled her body, grabbed her by the throat and dragged her into the bathroom. There he forced her head under the water in the half-filled tub and held it there while she struggled desperately for her life. In any event, defendant was not prejudiced by the submission of this factor since the jury made no finding on it and defendant did not receive the death penalty for the murder of Denise Worley.

[28]    Finally, defendant argues that the aggravating factor of a course of conduct, N.C.G.S. § 15A-2000(e)(11), for the murders of Denise Worley and Psoma Baggett should not have been submitted for the jury's consideration. Defendant is mistaken. Such a submission under the evidence in the two cases was entirely proper. *See State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983).

[29]   Next, defendant contends that his motions to have two mitigating factors submitted to the jury were improperly denied. The motions asked for the submission of the statutory mitigating factor that defendant acted under duress or under the domination of another person because the evidence showed defendant to be a daily and habitual user of alcohol and drugs, N.C.G.S. § 15A-2000(f)(5), and the nonstatutory mitigating factor of defendant's parental obligations because the evidence showed that he contributed to the support of his two minor children, *see* N.C.G.S. § 15A-2000(f)(9). We conclude that the trial court properly denied defendant's motions. Nothing in the transcript reveals that defendant was an excessive user of drugs or alcohol which might have brought him under Robinson's influence in committing the murders. The only evidence as to defendant's parental obligation came from defendant's mother, who testified that defendant's daughter lived with her and that defendant visited her and brought her gifts. The evidence on both these mitigating factors was simply insufficient to require their submission to the jury.

[30]   Defendant's next assignment of error concerns the issues and recommendation sheet in the case of the murder of James Worley. Defendant asserts that the trial court's instruction on the sheet, which directed the jury to indicate death as the appropriate punishment if it should find that the aggravating factors outweighed the mitigating factors and were, when considered with the mitigating factors, sufficiently substantial to call for the death penalty, was in effect a removal of that determination from the jury's province. We have repeatedly upheld the validity of such an instruction. *State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279 (1987); *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L.Ed. 2d 342 (1985); *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203. This assignment of error is overruled.

[31]   Defendant also argues in a separate assignment of error that the verdict sheet in the case of James Worley was so complicated that it necessarily resulted in confusion amongst the jurors and prejudice to him. We have scrutinized the issues in this case as they were submitted to the jury. We find them in

compliance with our directive in *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308 (1983), that the order and form of the issues to be submitted to the jury should be substantially as follows:

(1) Do you find from the evidence beyond a reasonable doubt the existence of one or more of the following aggravating circumstances?

(2) Do you find from the evidence the existence of one or more of the following mitigating circumstances?

(3) Do you find beyond a reasonable doubt that the mitigating circumstance or circumstances you have found is, or are, insufficient to outweigh the aggravating circumstance or circumstances you have found?

(4) Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?

*Id.* at 32-33, 301 S.E. 2d at 327. This assignment of error is rejected.

[32] Defendant now brings to our attention several assignments of error relating to the removal of a juror between the guilt-innocence and sentencing phases of the trial. The record reveals that on the morning the sentencing phase began, female juror Simmons was crying uncontrollably. She told the trial court that she felt incapable of remaining on the jury, but explained that she did not think that the prospective sentencing phase was the cause of her condition. Defendant complains that the trial court immediately excused juror Simmons, without asking her to go to another room and make an effort to compose herself. Juror Simmons was the only black female who sat as a juror at the guilt-innocence phase of defendant's trial. The trial court replaced her with the first alternate juror, a white male. Defendant argues that juror Simmons should have been allowed an opportunity to recover her equanimity.

The decision to replace a juror with an alternate juror is within the trial court's discretion. *State v. Stanley,* 227 N.C. 650, 657, 44 S.E. 2d 196, 200 (1947); *State v. Nelson,* 298 N.C. 573, 260

S.E. 2d 629 (1979), *cert. denied,* 446 U.S. 929, 64 L.Ed. 2d 282 (1980).

> The trial judge has broad discretion in supervising the selection of the jury to the end that both the state and the defendant may receive a fair trial. This discretionary power to regulate the composition of the jury continues beyond empanelment. It is within the trial court's discretion to excuse a juror and substitute an alternate at any time before final submission of the case to the jury panel. These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error.

*State v. Nelson,* 298 N.C. at 593, 260 S.E. 2d at 644 (citations omitted). *See also* N.C.G.S. § 15A-1215 (1986). Here, the trial court described juror Simmons as distraught and highly emotional. She could speak only with difficulty. She informed the trial court that she could not control herself. We fail to find an abuse of the trial court's discretion where the record so clearly demonstrates that an immediate replacement was necessary. Having excused and replaced juror Simmons, however, the trial court sent her to the jury room. Defendant maintains that this action violated N.C.G.S. § 15A-1236(c) because juror Simmons was no longer a juror and should not have been in further contact with the other jury members. He moved for a mistrial, and the trial court denied his motion. Defendant now argues that juror Simmons might have communicated her feelings about the three cases to her former colleagues. He also argues the possibility that a juror who is excused after the guilt-innocence phase might have voted for life imprisonment while the alternate juror who did not determine guilt-innocence might vote for the death penalty. Defendant contends that such is the case here. Both these arguments are mere speculation. The record shows that when the trial judge ordered juror Simmons to be returned to the jury room, he admonished her not to speak to the other jurors "about it."[1] We will not assume that juror Simmons ignored the trial court's admonition. Neither will we assume that the alternate juror, who replaced juror Simmons and who was present throughout the guilt-innocence phase, either automatically voted for the death penalty or

---

1. "It" presumably refers to the case.

failed to follow the trial court's instructions. The trial court properly denied defendant's motion for a mistrial.

[33] Defendant, in two separate arguments, next argues that his prior conviction for involuntary manslaughter should not have been introduced, N.C.G.S. § 8C-1, Rule 403 (1986), because its probative value was outweighed by its prejudicial effect. These arguments are totally without merit. Defendant admitted the conviction and stipulated to it. The evidence of the conviction is clearly admissible in the sentencing phase of defendant's trial as an appropriate method of establishing the N.C.G.S. § 15A-2000(e)(3) aggravating factor. *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981). These assignments of error are overruled.

[34] Next, defendant argues that North Carolina's death penalty statute, N.C.G.S. § 15A-2000, is unconstitutional under both the state and federal constitutions. We have consistently and repeatedly held that this state's capital sentencing scheme is constitutional, *see, e.g., State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), and that N.C.G.S. § 15A-2000 is constitutional, *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197; *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied*, 456 U.S. 932, 72 L.Ed. 2d 450 (1982); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L.Ed. 2d 1181 (1980). We decline to depart from these decisions.

Next, defendant finds fault with the trial court's supervision of his counsel's jury arguments. We have closely scrutinized the transcript pages to which defendant draws our attention. Having read in context the phrases to which defendant excepts, we find no error.

[35] Defendant now assigns error to several aspects of the trial court's charge to the jury at the sentencing phase of his trial. This he does with fifteen individually numbered issues clumped together and one numbered separately and out of sequence. First, he contends that the trial court committed reversible error by expressing an opinion in commenting directly to the news media in beginning its jury charge. This comment, he argues, could only have had the effect of demonstrating to the jury that its actions were subject to close public scrutiny, thereby prejudicing defend-

ant's chances of receiving a fair determination in sentencing. This argument is meritless. In referring to the issues and punishment recommendation sheet, the trial court spoke as follows:

> I note that there are several members of the news media present and they will have an opportunity not to get a copy but to look at a copy that I have if they need to. It is mainly to give them a little more comprehension about what they are trying to write about.

This was not an opinion; rather, it was a neutral statement and could have had no effect whatsoever upon the jury's sentencing decision.

[36] Second, defendant contends that the trial court's "numerous" denials of his requests to "correct" the jury instructions constitute prejudicial error. We do not agree. We have studied the pertinent passages in the transcript. In some instances, the trial court did in fact give a suggested additional instruction; in others, it had already given a proper instruction on the particular point about which defendant now complains; and in yet others, the trial court properly found no basis for defendant's dissatisfaction. These assignments of error are rejected.

[37] By his next assignment of error and a later, repetitive assignment, defendant contends that the trial court erred in denying his motion to impose a life sentence after the jury had deliberated for seven hours. He argues that the time period was sufficient to indicate that the jury was unable to reach a unanimous decision as to the death penalty and that the trial court should have declared a mistrial and imposed a life sentence pursuant to N.C.G.S. § 15A-2000(b). We are unable to agree with defendant's argument. In *State v. Johnson*, 298 N.C. 355, 370, 259 S.E. 2d 752, 762 (1979), we held that what constitutes a reasonable time for jury deliberation in the sentencing phase of a capital trial is a matter within the trial court's discretion. We have noted also that some cases may involve varying numbers of aggravating and mitigating factors which the jury must consider. *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983). In *Kirkley*, we held that a deliberation period of seven and one half hours was reasonable where there were two separate cases, each with one aggravating factor and fourteen mitigating factors. Defendant's jury

was considering three separate cases. The murder of James Worley required consideration of two aggravating and six mitigating factors; the murder of Denise Worley, four aggravating and six mitigating factors; and the murder of Psoma Baggett, three aggravating and six mitigating factors. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to declare a mistrial and impose a life sentence. Defendant goes on to contend in a later section of his brief that in addition to the lengthy deliberation, the jury's obvious confusion and lack of unanimity with regard to certain issues were sufficient to warrant a mistrial. This argument is without merit. The transcript reveals that defendant had at that point of the trial made a motion, not for a mistrial, but for imposition of life sentences by the trial court in the cases of Denise Worley and Psoma Baggett. Since the jury imposed life sentences in both cases, defendant has suffered no prejudice.

[38] Defendant presents another ground upon which he asserts that his motion for mistrial should have been granted. After the jury had completed its task in the guilt-innocence phase and had begun deliberating in the sentencing phase of defendant's trial, the foreman asked the trial court several questions about the acting in concert theory. The foreman stated that he did not know what acting in concert meant and asked for an explanation. The trial judge replied that he would be happy to explain the concept after the jury had completed deliberation on defendant's punishment. Defendant contends that the foreman's remark demonstrates that he had applied a legal theory that he did not understand in determining defendant's guilt or innocence. The State, on the other hand, contends that the foreman's questions about acting in concert related to a concern about imposing the death sentence on defendant under circumstances where his cohort Robinson may have been the principal actor. Since the jury decided that defendant should receive life imprisonment rather than the death penalty for the murders of Denise Worley and Psoma Baggett, the State argues that any confusion on the foreman's part inured to defendant's benefit rather than to his detriment. Although the transcript is not clear on this point, we agree that defendant was not prejudiced. The trial court had ample evidence before it to warrant the acting in concert instruction to the

jury and its instruction on the concept was proper in all respects. We therefore overrule this assignment of error.

[39]   In a further assignment of error, defendant contends that the trial court erred in allowing an unidentified juror who was not the foreman to express an opinion in open court during the sentencing phase about the confusion she perceived to exist in the sentencing forms. The transcript reveals that the jury experienced some difficulty in completing the forms in the cases of Denise Worley and Psoma Baggett. The foreman was explaining the jury's difficulty to the trial court when the female juror asked permission to speak. The trial court allowed her to do so, and she then simply clarified the foreman's explanation of the jury's confusion. She did not speak again. Even if we found this to be error, and we do not, defendant received life sentences in both these cases and thus cannot demonstrate prejudice here.

[40]   Defendant's next argument is that the trial court erred in refusing to accede to the jury's request to see an exhibit. The trial court informed the jury that it could only view exhibits during the trial while sitting together in the jury box. Defendant asserts that this answer violated N.C.G.S. § 15A-1233(b). We agree that the trial court misstated the law, but we do not find prejudice to defendant. The transcript shows that the jury did not unequivocally demand to see the particular exhibit. Moreover, defendant failed to object to the trial court's statement, and this assignment of error has been waived. N.C.G.S. § 15A-1446 (1986).

[41]   We now address defendant's several complaints about the jury poll, all of which are similar and should have been grouped together in the brief. After deliberation, the jury originally returned with a recommendation to impose the death sentence in all three cases. A jury poll was taken, at which time one of the jurors, Ms. Mobley, recanted her decision to recommend death in the cases of Denise Worley and Psoma Baggett. Defendant's basic contention is that he should have been permitted to poll juror Mobley again as to her decision in favor of the death penalty in the James Worley case. He also argues that since juror Mobley's recantation in the Denise Worley and Psoma Baggett cases demonstrated dissension and confusion among the jurors, defendant should have been permitted to repoll the twelve, to "see if they, in fact, disagreed with the decision . . . as stated by the

foreman." In this regard, he maintains that his motion for further jury deliberation was erroneously denied by the trial judge. Finally, he asserts that juror Mobley was erroneously denied her request to speak after she had recanted on the two death sentences. N.C.G.S. § 15A-1238 (1986). We find no merit in any of these complaints.

The transcript reveals that juror Mobley was polled twice in regard to her death sentence decision in the James Worley case, once during the normal course of polling after the jury's death sentence recommendation in all three cases and again after she had recanted in the Denise Worley and Psoma Baggett cases. When asked whether she wanted to reconsider the death sentence in the James Worley case, juror Mobley replied that she stood by her original decision in that instance. We do not believe that further polling of juror Mobley or an individual explanation of the rationale for her decision to recant in the Denise Worley and Psoma Baggett cases was necessary. The jury had reached a unanimous verdict in its recommendation of the death penalty for the James Worley murder and in polling, juror Mobley twice reconfirmed her vote. There was no reason for the jury to deliberate further in the James Worley case. Moreover, a trial court has no authority to change a jury's sentence recommendation. *State v. Jackson*, 309 N.C. 26, 45, n.3, 305 S.E. 2d 703, 716, n.3 (1983).

Defendant now brings forward seven assignments of error concerning the trial court's denials of his motion to dismiss, motion for mistrial, motion for judgment notwithstanding the verdict and motion for appropriate relief. In these assignments, defendant refers the Court to arguments made earlier in his brief. As we have already addressed these issues, we decline to readdress them here.

Defendant next draws the Court's attention to several aspects of the trial court's charge to the jury during the guilt-innocence phase of defendant's trial that he contends were erroneous. He also complains about "incomprehensible verdict sheets" and the "totally unmanageable nature of the proceedings." These contentions are inexplicably out of sequence, are virtually identical to defendant's prior contentions on the same subject and have been previously addressed.

Four instances of the trial court's dealing with the jury now come under criticism from defendant. Specifically, he argues that the court erred in its (1) instructions to the jury about sentencing alternatives, (2) delivery of the penalty phase verdict sheets to the jury foreman out of his colleagues' presence, (3) admonitions to the jurors not to become ill, and (4) instructions to the jury about its consideration of mitigating factors.

[42]  First, defendant contends that the jury should have been allowed to add comments if it wished in the punishment blanks on the verdict sheet. This contention is without merit. Under N.C.G.S. § 15A-2000(b), the jury is required to consider aggravating factors and mitigating circumstances and then to determine "whether the defendant should be sentenced to death or imprisonment in the State's prison for life." These are the only alternatives allowed the jury. Other comments or notations are irrelevant. Second, defendant argues that the trial court impermissibly conversed individually with the jury foreman when handing the verdict sheets to him out of the presence of the other jurors. We have reviewed the trial court's comments; they are entirely innocuous and convey nothing about the evidence or the court's personal opinion of the trial. We note that defendant failed to object at the time. *See* N.C.G.S. § 15A-1446 (1986). Defendant's argument is without foundation in fact. Third, defendant contends that the trial court erred in its statement to the jury that the trial would have to await the recovery of any sick juror before proceeding. Once again, we find no merit in defendant's argument. One juror had already been excused because of incapacitation. The trial court's remarks appear in the nature of a warning to the twelve that they should not feign sickness to avoid their duty of recommending defendant's punishment. Since no other juror requested removal or showed any evidence of illness during deliberations, defendant has failed to show prejudice of any kind. Finally, defendant contends that the trial court instructed the jury that it did not have to consider every mitigating factor in making its recommendation as to his punishment. This argument is meritless. The transcript shows that the trial court was responding to the jury foreman's questions about completing the blanks on the punishment recommendation sheet pertaining to aggravating and mitigating factors. The court properly instructed the jury that it had to fill in and answer all the aggravating fac-

tor blanks, but could leave the mitigating factor blanks empty if it did not find the factors by a preponderance of the evidence. These four assignments of error are overruled.

[43] Defendant goes on to argue, however, that his convictions and sentences should be set aside due to the "fatally defective nature of the charge, [the] required verdict sheets, [and the] required considerations of elements and factors." This opinion was originally filed on 2 June 1988. Subsequently, the United States Supreme Court filed its decision in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), which addressed the requirement of unanimity of the jury in finding mitigating circumstances in the sentencing phase of a capital trial. This Court, in conference, determined to treat the above-referenced argument as having raised the *Mills* issue and concluded that there should be additional briefing and argument in this case and all other cases presently before the Court with respect to the issues raised by *Mills*. This opinion was withdrawn on 13 June 1988, and supplemental briefing on the applicability of *Mills* was ordered on the same date. Oral argument was ordered on 28 July 1988 and was heard on 22 August 1988. For the reasons expressed in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), we reject defendant's argument based upon the holding of *Mills*.

[44] Finally, defendant argues for reversal of his convictions and sentence or, alternatively, for a new trial, because the court reporter took eighteen months to prepare the transcript of his trial and because, in his view, its condition is such that it precludes meaningful appellate review. Defendant mistakenly relies upon *State v. Sanders*, 312 N.C. 318, 321 S.E. 2d 836 (1984) (per curiam), which involved a transcript so incomplete and inaccurate that one could not distinguish between transcript error and reliable trial testimony reporting. Although the transcript in the case *sub judice* cannot be described as a model of reporting service, it is not so inaccurate as to prevent this Court from reviewing it for errors in defendant's trial. Defendant's assignment of error in this regard is overruled.

Having found no error in the guilt-innocence or sentencing phases of defendant's trial, we now undertake our solemn statu-

tory duty of reviewing defendant's convictions and sentence of death for proportionality. N.C.G.S. § 15A-2000(d)(1) (1986).

## IV.  PROPORTIONALITY REVIEW

[45]  In conducting the review, the Court uses as a pool of cases for comparison purposes all cases which were tried as · capital cases after 1 June 1977 where the jury recommended death or life or where life was imposed due to an inability on the jury's part to agree on a sentence, and which were found to be without error on direct appeal. *State v. Williams*, 308 N.C. 47, 79, 301 S.E. 2d 335, 355. In making the comparison, the Court does not simply engage in rebalancing the aggravating and mitigating factors; rather, it is obligated to scour the entire record for all the circumstances of the case *sub judice* and the manner in which defendant committed the crime, as well as defendant's character, background, and physical and mental condition. *State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503, *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985).

We have compared both defendant and the crime to the roughly similar cases in the proportionality pool and to those cases found disproportionate to date. We conclude that defendant's death sentence is proportionate.

Defendant received the death sentence for the murder of James Worley. The jury found the two aggravating circumstances submitted to it beyond a reasonable doubt: (1) defendant had previously been convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3), and (2) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). Of the mitigating circumstances submitted to it, the jury found three by a preponderance of the evidence: (1) defendant aided in the apprehension of another capital felon (the State's witness, Eddie Robinson), N.C.G.S. § 15A-2000(f)(8), (2) defendant has a low mentality with an IQ of 72, and (3) defendant had been employed at Cape Craft Pine for fourteen years and there he had been a good, dependable worker, well thought of by his supervisor and his fellow workers. The jury refused to find that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, and it failed to answer whether defendant had been a person of good character and reputation in the community.

The proportionality pool presently contains one other contract killing case, *State v. Lowery*, 318 N.C. 54, 347 S.E. 2d 729 (1986). In *Lowery*, James Small, the victim's husband, hired Lowery and another man named Johnson (subsequently the State's witness) to murder Mrs. Small. Lowery and Johnson strangled her to death. Lowery and James Small were tried jointly and the jury recommended death for Small but life for Lowery. The record on appeal in *Lowery* reveals that the jury found that the murder was especially heinous, atrocious or cruel and that it was committed for pecuniary gain. In mitigation, however, the jury found that Lowery's capacity to appreciate the criminality of his conduct was impaired, N.C.G.S. § 15A-2000(f)(6), and that other nonstatutory mitigating circumstances existed. In contrast to the *Lowery* case, defendant in the case *sub judice* did not make a N.C.G.S. § 15A-2000(f)(6) showing. Moreover, the presence here of the aggravating circumstance N.C.G.S. § 15A-2000(e)(3), a prior felony involving the use of violence to the person, differentiates defendant's case from *Lowery*. Also, unlike Lowery, defendant had already killed once when he killed James Worley. N.C.G.S. § 15A-2000(e)(3) reflects upon defendant's character as a repeat offender. "N.C.G.S. § 15A-2000(e)(3) in particular tends to demonstrate that the crime committed was part of a long term course of violent conduct." *State v. Brown*, 320 N.C. 179, 224, 358 S.E. 2d 1, 30 (1987). Lowery killed one person. Defendant killed four persons—three of them within a two-month period.

To date, this Court has vacated the death sentence as disproportionate in six cases: *State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 384 S.E. 2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983). None of these cases involved a contract killing. In *Bondurant, Hill, Jackson* and *Stokes*, we noted that the State had failed to show that the defendants there had coldly calculated or planned the commission of the murders over a period of time. Such is not the case here. Here, the State's evidence showed that defendant carefully planned James Worley's murder and schemed about how best to accomplish it. In none of the cases found disproportionate had the

defendant killed another person prior to the murder for which he received the death penalty. Here, defendant had killed once before the James Worley murder and he killed again, twice, after it to cover his involvement. In *Stokes* and *Young*, the defendants were relatively young. In *Bondurant*, the defendant tried to help his victim and exhibited great remorse. In *Stokes, Bondurant, Hill* and *Jackson*, the defendants were drunk or mentally impaired at the time of the crimes. Here, none of these mitigating factors existed. We are unable to conclude that defendant's murder of James Worley "does not rise to the level of those murders in which we have approved the death sentence upon proportionality review." *State v. Jackson*, 309 N.C. at 46, 305 S.E. 2d at 717.

Defendant compares his case with *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181; *State v. Whisenant*, 308 N.C. 791, 303 S.E. 2d 784 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703, because in common with defendant's case, they all involved the pecuniary gain aggravating circumstance, N.C.G.S. § 15A-2000(e)(6). Unlike Young, Whisenant and Jackson, however, defendant was a contract killer, not an armed robber. Defendant murdered James Worley, a man against whom he had no personal grudge, at the instigation of Worley's wife, for monetary consideration. The calculating nature of this contract killing is illustrated by defendant's preparations — selecting the weapon and readying the gasoline — and by his actions after the murder — dressing the corpse and then burning it in the car to suggest accidental death. This was a cold-blooded contract murder, not comparable to the armed robbery felony-murders in *Young, Whisenant* and *Jackson*. We hold that defendant's violent history as well as his brutality and calculation in the killing and disfiguring of his victim's body and his total lack of remorse for the murder as demonstrated by his further murders of James Worley's wife and her small child fully support the jury's recommendation of death in this case.

We have addressed all of defendant's assignments of error and have scoured the record and transcript of his trial in all three cases. We conclude that defendant received a fair trial and a sentencing hearing free from prejudicial error before an impartial judge and jury. The convictions are supported by the evidence. The sentence of death is also supported by the evidence and is not disproportionate.

No error.

Justice FRYE dissenting as to sentence.

For the reasons expressed in the Chief Justice's dissenting opinion in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), which I joined, I believe the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), requires that defendant be given a new sentencing hearing. Accordingly, I dissent from that portion of the Court's opinion which rejects defendant's argument based upon the holding of *Mills*. I concur in the remainder of the Court's opinion.

Chief Justice EXUM joins in this dissenting opinion.